The next matter, number 25-1940, AbbVie, Inc., et al. v. Peter F. Neronha, et al. At this time, would counsel for the appellants please come to the podium and introduce himself on the record to begin? Good morning, Judge Ruckelman. May it please the Court, Matthew Owen on behalf of AbbVie. If I could reserve two minutes for rebuttal, I would appreciate it. You may. Your Honor, as you know, we have a number of related cases before the Court this morning, and counsel for the various appellants have endeavored to divide some issues in order to avoid overlap. So just to give you a preview, I think you'll hear more detailed arguments about various preemption matters from counsel for Novartis and for PhRMA and the United States. I think, in particular, PhRMA and the United States will focus on, let's say, the set of arguments flowing from McCulloch v. Maryland and intergovernmental immunity. What I'd like to do before, in my time at the outset, is to do a little table setting and make sure I talk about the relationship between our Supremacy Clause and our Takings Clause claims. And before I sit down, I'd like to hope I get to talk about the Administrative Dispute Resolution Rule, which I think is a totally independent issue, no matter what you think of all the other kind of messy matters in the case. So at the outset, the government that is the state of Rhode Island has a pincer to deal with. They are between, I think, a rock and a hard place. And at a really high level, that is because either this Rhode Island statute operates within the federal 340B program and mucks around with its conditions, in which case it is certainly preempted, or it is an independent state police power regulation that rises and falls on its own two feet, has nothing to do with the 340B program, in which case it is a taking, because the nature of the Rhode Island statute is to compel manufacturers to surrender property that they have not agreed to surrender in their deal with Congress. That is the high-level problem. The concrete way that you know this is a problem is because the government, the state's brief, points at each other and says opposite things in defense of the two claims. If you compare page 20 of the red brief, where they say the Rhode Island law does not impose additional conditions beyond what Congress did in 340B, with page 42 of the red brief, where in defense of the takings claim, they say that the statute, that their Rhode Island law fits within the voluntary participation doctrine because states may, quote, you know, impose additional conditions on voluntary federal programs. That is, the state cannot make up its mind whether it is tinkering with a federal law or operating outside the federal law. What I'd like, I think the best way to resolve this, however, is to anchor our, at least I would like to anchor our discussion in the text of the statute, which I think the brief on the red side, that is on the state side, doesn't deal with directly. What the statute says, what its text says, which is what matters, is that a manufacturer shall not deny, restrict, prohibit, or otherwise interfere with, either directly or indirectly, whatever that means, with the acquisition of a 340B drug or delivery of a 340B drug. So what the statute says in a kind of double negative way is that if I'm a drug manufacturer, I cannot deny the acquisition of my own property by somebody else. And what that property is is defined as a 340B drug. The definition in the Rhode Island statute of a 340B drug is a drug that is subject to an offer under the 340B program at that reduced price. So we know from the text of the statute that what it says is you have to sell your drug. You cannot refuse to sell your drugs at this price if you want to. Now, the federal obligation that we have under the D.C. Circuit's opinion in Novartis and the Third Circuit's decision in Santa Fe is that we have a right to participate in Medicare Part B and Medicaid while maintaining a one-contract pharmacy policy, a requirement that claims data be provided to us if covered entities want 340B pricing. That's what we're allowed to do under the federal scheme. And this court's decision in Cormier, which I think is probably the best way of conceiving of the problem, is that if federal law implicitly says or explicitly you can participate in this program, this federal program, if you do A, B, and C, a state cannot come along and say, actually, no. Just because you satisfy the federal conditions, if you want to get that federal benefit, you have to do something more. And that's what they've done here. I want to make sure I don't ask you about preemption because you told me your colleagues are going to argue about it. So I'm trying to figure out how to ask you my question. Answer your question. Let's just assume for a moment that based on the argument you just made, you've made an argument premised on the theory that 340B explicitly gives you a right to do X, Y, Z, and this statute conflicts with it. Let's put that aside for a moment. Let's say we may not agree with you on that. If we focus on the takings issue and we just think about takings, there is this argument about its voluntary participation. You've responded. You've relied on Valancourt. Is there really support for the notion that assuming the law isn't preempted and, therefore, states can add on conditions that they have to, in order to add on those conditions, they also have to give you a benefit? I mean, what case can you point to that really supports that? Well, Your Honor, what I would say is that if in the circumstance by hypothesis where Congress has left it open to states to pass regulations in a particular area, if that condition is give up your property to a private person for no compensation and not for public use, they would have to satisfy the Constitution about that freestanding regulation. In other words, we're not saying that every state rule or every state condition, if they could impose them because Congress didn't say one way or the other what had to happen, you could imagine all kinds of state regulations that wouldn't be a taking. But this one is give up your property. And I do think Valancourt is the right analogy. Horn v. Department of Agriculture is another one because the government made a voluntary participation argument in that case, too. And the Supreme Court said, no, no, if you are forcing someone to give up title to the chattel, that's the raisin, the government gets the chattel and you don't have it anymore. You don't have the right to control it. Voluntary participation in some broader economic program was not enough. That's an explicit holding of that court. The Supreme Court said you can't ransom back constitutional rights to be ransomed by waiver of constitutional protection. Here, it's very clear. AbbVie owns these drugs. They're our property. Congress and AbbVie have a bargain about how much we're going to give up in order to get access to Medicare Part B and Medicaid. See, that's where it's hard to disentangle the arguments because it seems that your takings argument is really premised on us agreeing with the preemption arguments or the intergovernmental immunity arguments about or the spending power arguments about the bargain. And if if one to if one instead looked at this as and I'm just asking to get your because I'm struggling with the takings argument. Sure. How to separate it. That's why I'd like your help. If one were to take a look at this program and say and I'm not saying that's what we would conclude, but say there really was silence. Congress did a few narrow things that wanted to fix the problems. The unintended consequences would happen two years after the Medicaid drug rebate program. So it went in and wanted to make sure that your clients were not charging covered entities the money that they were losing in the Medicaid rebate program. And then it created the ADR process, which I know you want to make sure you talk about. And that's all they did. And they didn't even though contract pharmacies were a background fact, they didn't deal with them. We don't know why. Maybe it was a political hot potato. We just don't know. There's lots of reasons why Congress doesn't address things. So it's a situation where there is a gap. And so now the state has come in to fill the gap and you're saying that's a taking. So if we think it's a gap, why is it definitely a taking? What's your best argument for that? And I'll make sure you can address your ADR. I appreciate that, Your Honor. So just to say this back, I think the court's question is, you know, suppose you lose the preemption argument. Don't you also have to lose the takings argument? And I think the answer to that is no. But I think the way to see it is there's two ways you could lose the preemption argument, really. And we would win the takings claim anyway, I think, in this case. So one version of losing the preemption argument is the reason there's no conflict between the federal law and the state law is because Rhode Island isn't requiring anything that Congress didn't require itself. That wouldn't be a gap. That would just be Congress also required you to sell drugs in unlimited quantities to contract pharmacies. And Congress also forbade you from requiring claims data. So there's no gap. Which two circuits have rejected that? Right. Precisely, Your Honor. If that were the rule, I think there would be – it would be a much harder case for me on the takings claim. Because if the reason we lost the preemption claim is that there was – they weren't filling a gap. They were just repeating the congressional rule, then we would lose the takings claim, I assume. But if instead the premise – and this is their argument. They're not making that argument. They agree, I think, that under federal law to participate in Medicare Part B and Medicaid, we don't have to sell our drugs to covered entities that want to use an unlimited number of contract pharmacies. And we don't have to sell them at all to covered entities that don't want to provide claims data for contract pharmacy use. And since that's true, their argument is Congress didn't regulate this one way or the other. This is just a gap. And we, the state, can just engage in police power regulation of an unoccupied field. Now, for the reasons my colleagues will explain, that's not true. This statute doesn't do anything except regulate 340B participation. But why is that a taking? The reason it's a taking is because if a state in any field of law, not just 340B, but anywhere where, by hypothesis, Congress hasn't preempted state laws, they can do what they want within their normal constitutional limits, they still have to comply with those limits. So here, if the gap, you know, just police power regulation is take your property, give it to that person without just compensation and without a public use, that's a taking because the conveyance of property isn't required by federal law. I think we've all agreed on that. We don't have to sell under federal law under these conditions. And because it's not a condition of the federal program, there's no voluntary participation defense. That's sort of Judge Sredevasan's point in the Valancourt Books case is that if you're being asked to surrender your property in exchange for no additional incremental benefit beyond what the law already gave you, which is true here, we have the right to participate in Medicare and Medicaid whether or not we comply with Rhode Island's law. And they acknowledge, again, page 42 of their brief, that they are imposing additional conditions on a voluntary federal program. And if those conditions amount to a taking, then it's no different than if they said anyone who participates in X federal program and lives in Rhode Island also has to allow searches and seizures of their house without a warrant. And any law that a state is saying is an exercise of their own police power and is not attached to some benefit at voluntary exchange has to be subjected to ordinary constitutional scrutiny. And if they don't get to plead the federal program, if by hypothesis they are saying this is a gap in the federal law, this is not something that Congress has specified, Congress allows manufacturers to continue to participate in Medicare under these conditions, it's just that Rhode Island doesn't allow that. And what they want instead is to force sales of our property. That has to stand on its own two feet. And but for the 340B program, if they could not point to the 340B program, they would have no defense against our takings claim at all. There is no argument that the Rhode Island law sets up a sort of comprehensive economic development plan of the kind that Kelo said was necessary. There's no argument that they are providing just compensation or that they've waived sovereign immunity. The only thing they can say is that, well, this is a condition we the state have imposed on a federal program, not because Congress like Medicaid invited states to do that. Here, instead, Congress just said we're going to have a contract, a piece of paper. It's a real piece of paper. It's in the record in this case, in the JA, between AbbVie and the United States, and here are the conditions of what you need to do to participate in Medicare. And the state says, in addition to that, you have to give away your property. Yes, I do have a question. But doesn't voluntary participation automatically forecloses the taking argument? No, Your Honor. I think voluntary participation would foreclose, I think this is really important, it could foreclose a takings claim against the United States. Because the United States is the one that provided the benefit that we voluntarily accepted in exchange for certain conditions. So the benefit we get is access to Medicare and Medicaid patients. We get to sell them our drugs, and we get reimbursed by the United States in exchange for those drugs. That's the benefit we get. And what we voluntarily agreed to in exchange for that was to comply with, let's just call it Sanofi and Novartis. We agreed that we would offer our drugs, but we were allowed to continue to receive that benefit if we imposed the very policy that's at issue in this case. So it just goes back to your point that you need to get a benefit from the state for it to be voluntary. Exactly, Your Honor, because they don't even argue that we are voluntarily participating in any state program. They are only saying we are voluntarily participating in a federal program, and they acknowledge that the conditions are being imposed by them, not the federal program. I think that they have pleaded themselves out of court on the voluntary participation doctrine. I promise on rebuttal, I'll give you extra time. Thank you, Your Honor. Thank you, Counsel. At this time, would Counsel for Narona please introduce himself on the record? Good morning, and may it please the Court. James Argwin on behalf of the Rhode Island Attorney General and Auditor General. And I'll follow my brother's lead and do some table setting at the outset, because I think there seems to be a great deal of obfuscation about what the purpose of the 340B program is, as well as the impact of Chapter 288, the state law in question. And whatever framing of the issue in terms of the claims that are presented, whether it be preemption or spending clause or taking clause, the reality is, is the touchstone for the analysis has to be congressional intent. And there, there can be no question of what the congressional intent was with respect to the 340B program and its impact on public health and safety. And let me start first with what the Supreme Court itself has said in the Becerra decision. And there, it observed that Congress intended the 340B program's drug reimbursements to subsidize services provided by 340B hospitals and other providers that were geared to providing valuable services for low-income and rural communities, so they had better access to health care that was lacking. And the mechanism by which it did that was not to give them federal money. In fact, Congress recognized that there were limited federal dollars available to support expanded health care in vulnerable and low-income communities. What it did instead was a novel creation of using the leverage of the Medicaid and Medicare reimbursement scheme, which were very profitable to the pharmaceutical manufacturers, to require them to discount the sale of outpatient drugs to covered entities for use by their patients so that they could receive the medication at reduced cost. And then those savings subsidized the whole public health center. It's not individual patients. It's not an individual covered entity. It is public health writ large. And that was the intent of Congress in enacting the 340B program. A couple of questions based on that. Was the intent of Congress to provide unlimited funds to promote those purposes, or was there some potential limitation on the amount of funds? Two points. As I mentioned, Congress did not provide funds, right? Congress provides subsidies generated by reduced pricing that it required the manufacturers to provide to covered entities. But those were not unlimited, right? There's two conditions imposed by the 340B statute directly on covered entities and specifically for how they obtain those discounted prices. First, they must be a recognized covered entity, which is a list maintained. Requirements are set out in the statute, and there's a list maintained by federal regulators of who is a qualified covered entity. And second, and most importantly, it's not any drug the covered entity prescribes. It must be a drug prescribed to a patient of the covered entity. And so that is the key. Those are limitations in and of itself. And the pharmaceutical pricing agreements, which are the contracts that really just repeat the statutory terms, and it's the mechanism by which pharmaceutical manufacturers opt into the program, they specifically say that those agreements commit the manufacturers by signing on to the federal program that they will sell, they will provide the covered entities with 100% of the drugs that are prescribed to its patients at the discount pricing. This idea that they're somehow... But it might be a little bit more than that. I think at least the argument on the other side is that this is on the background of the right of the manufacturers to adopt some limitations. And so which brings me to my next question to follow up on what I first asked, is congressional intent even the right analysis, the right lens to bring? And I suppose we're now in the preemption context, whereas your friend was arguing takings primarily right now. But it seems to me that we've backed away from a pure congressional intent inquiry to more ask about rights and obligations and whether the state has imposed something that either precludes them from getting a right or an obligation. So I'm not sure that we should be engaging in a pure congressional intent. What was Congress thinking? But rather the question would be, did Congress give them a right to impose certain limitations? And two responses, Your Honor. The first is this is relevant to why the state law was enacted, right? The state law is responding to a situation where since the beginning of the 340B program, federal regulators in Congress recognized that contract pharmacies were an essential part of the program because safety net health care providers lacked the resources to establish their own pharmacies. They had to rely on contract pharmacy arrangements in order to prescribe drugs to their patients so that the patients could then pick them up and get the medication that they were prescribed. The manufacturers have followed that policy for at least 10 years, or actually since the beginning of the program where it was one contract pharmacy, and since 2010 to an unlimited number of contract pharmacies. It's only recently that some manufacturers, and I stress not all, have started restricting the use of these contract pharmacies arrangements, which is where the state law comes in because even the federal regulators noted that those contract pharmacy arrangements were not covered by federal law because the federal law didn't discuss delivery of medications to patients. It was completely silent on those issues as two circuit courts have now, or three circuit courts have now squarely decided. But what it does is those contract pharmacy arrangements were essentially covered, and the federal regulators acknowledged this, by state law contract principles. And that's where the decisions that they rely on from the Third Circuit and Sanofi and the D.C. Circuit and Johnson come in because in those cases, those circuit courts said that as a matter of contract law, since the 340B statute itself was silent about delivery and distribution of drugs, the parties to the contract, meaning the 340B, the manufacturers, and the covered entities could negotiate additional terms that were not covered by federal law. And specifically, they noted that those additional conditions included other provisions of law, including state law. What they never said is you manufacturers have a unilateral right to impose whatever condition you may dream up on the right of covered entities to recoup the savings and the subsidies that Congress intended them to receive in exchange for providing services to low-income and vulnerable communities. They assert that right, but it has no basis in law, and it's not a basis of the decisions on which they rely. There is absolutely nothing in the Third Circuit decision or the D.C. Circuit decision that gives them an unfettered right to operate without regard to state law. I don't think that they're asking for an unfettered right to operate with disregard to state law. I think, as I understood the arguments yesterday at least, it seems they were conceding that they would have to follow generally applicable state laws, but rather that this specific right was in fact recognized by the other circuits, and so that this particular right is one that they get to exercise even if the state says otherwise. The only recognition that came out of those earlier decisions is that it's governed by contract law. The states, of course, and the federal regulators have also recognized that the use of contract pharmacy arrangements are governed by state contract principles or agency principles. That's in the 1996 guidance, the 2010 guidance, the 2020 guidance. Those principles are not at issue. This brings me back to the original purpose. Congress wanted these subsidies to be a way of subsidizing the expansion of care in low-income and other vulnerable communities. These restrictions that the manufacturers themselves impose, and I agree, they say we have to impose reasonable conditions, but what's reasonable today is not what's reasonable tomorrow. And one more thing about the reasonableness. One need only look at the legislative record that was before the Rhode Island General Assembly to see the drastic effect that these policies are having on the ability of covered entities in Rhode Island to continue to provide the care that Congress intended them to provide as safety net health care providers. Could I just ask you to address directly the takings argument? I understood your brief to be saying, to be relying on the contention that there's no takings because of the voluntary participation, but of course the Peasant Council says it was voluntary, only as to the federal government, which left this gap, and they never agreed to provide an unlimited number of these drugs and therefore have an unlimited number of discounts. That just wasn't part of the voluntary participation, and you needed to offer them something else for this not to be a taking. Can you respond to that specific argument? Certainly, if you don't mind me going over it. Go ahead. I think our argument on the takings is more fundamental also. There is no taking. You know, the pricing agreements that they enter into to voluntarily enroll in the 340B program require them to provide the covered entities with 100% of the drugs needed by their patients at the discount pricing. So your argument is really there wasn't silence about that, that because there was no cap and they have to provide, in your view, 100%, that that was part of the voluntary participation. The point is that is exactly the fundamental obligation they assume under the 340B program. That is the only part, the pricing of the drugs supplied to covered entities for use by their patients is the only thing the 340B program concretely addresses. And the point on the taking claim is they have received the full compensation, and they continue to receive the full compensation, to which they are entitled based on supplying drugs to covered entities for use by their patients, no more, no less. And Chapter 288, the state law, does nothing to change that. This is absolutely unlike the horn case, the raisin case, where the federal government sees the raisins without any compensation. They receive the price pursuant to the ceiling price that Congress establishes as a condition for them if they enroll in the 340B program, which it again leverages against the benefit of getting reimbursements of the Medicaid and Medicare Act. And that is a valuable contribution that they receive, and it's not just from the federal government. We're not confused about that in any way, shape, or form. The benefit that they're receiving from federal Medicare includes what drugs are covered under your state plan. Rhode Island state plan can determine which drugs are covered. And if the pharmaceutical companies don't participate in the 340B program, those drugs need not be covered under Medicare or Medicaid because they say it has broad discretion. And I would also add there are other benefits provided by 288, which include increased transparency, something that they complain about, that they don't understand the uses that the covered entities are putting, the subsidies that they're obtaining under the 340B program to use. The state law also addresses that and requires covered entities to provide annual reports on that. Thank you, counsel. So the public has a better idea of how money is being spent. Thank you very much. So thank you for allowing me to go over. Appreciate it. Thank you. At this time, would counsel for the appellants please reintroduce himself on the record? He has a one-minute rebuttal. I'm sorry, two minutes. May it please the court. Matthew Owen again for AbbVie on rebuttal. I want to make three points if I can. The first is in response to the takings claim, Judge Rickleman, I don't know about the court, but I did not hear any defense of the voluntary participation argument that the state advanced in its brief. I just don't think they can say with a straight face that it's okay for them to add additional conditions and call that voluntary participation in the federal program. Instead, what he said was actually just Sanofi and Novartis are wrong. The D.C. Circuit and the Third Circuit are wrong, and you have to sell an unlimited amount of drugs under the federal scheme. I don't think that argument is right. It's also not really in their brief. And what he said is that the PPA says that we have to, you know, provide, you know, 100% of orders. That's not what it says. Judge Katz's opinion in the Novartis case carefully explains where the rule that we're allowed to impose these conditions comes from, and it comes from the text, the best interpretation of the text of the 340B statute, which only requires us to make an offer. And the Congress set the price term of the offer, but it didn't set the others. And so as long as there's a federal standard to be applied, for sure, it's not totally lawless. It has to add up to a bona fide offer. I didn't hear any response to the argument that we made before. Second, in terms of preemption, just very quickly, I think the state said a lot about preemption. I only want to make this one point, and I'm sure my colleagues will address it. The state continues to say that this is a delivery regulation. Again, the text of the statute says acquisition or delivery. And if you were – there are cases going both ways in this area, as I'm sure the court knows. If you find any opinion where the manufacturer's lost and look in that opinion for a substantive treatment of the word acquisition, you will not find one in any of those cases. Second, we know this is not a delivery regulation because the drugs are already delivered, paid for, and ingested. By the time anyone determines whether a drug is 340B eligible, it is a retroactive accounting measure. What happens is government entities and pharmacies buy drugs from AVI for a penny, resell them to the poor at full price, and later decide whether that person was a 340B patient. That has nothing to do with delivery. And the way you know it for sure, Your Honor, is that on pages 53 and 54 of the red brief, the state explains how much revenue and additional money is at stake. The postage doesn't cost tens of millions and hundreds of millions of dollars. What costs that money and what generates that revenue is forced sales, changing the price of a sale that we are now required to make under Rhode Island law. For all those reasons, you know this is not a delivery regulation occupying some gap in a federal scheme. It is just tinkering with the core of the federal scheme, which is preemptive. Lastly, very quickly on ADR. The 340B statute gives, in Section D1, 2, and 3, the ADR tribunal authority to adjudicate claims about overcharges. ASTRA preceded, ASTRA v. City of Santa Clara, if you read it, says over and over again that the agency has to have complete control of the program. The control reign has to be a unified, harmonious scheme, and that allowing lawsuits about overcharges would defeat that, so we can't have those lawsuits. After ASTRA was decided, the agency promulgated a regulation, which is now 42 CFR 10.21a, that defines what an overcharge claim that that tribunal has authority to hear as a claim involving any limitation imposed by a manufacturer on access to 340B pricing. In other words, not just, I charged you too much for something that you did buy, but I wouldn't let you buy it at all at that price, which is exactly what our policies do. The reason the regulation includes those claims is because covered entities lobbied the agency to make sure that they did. So what is going on here is that this state law, all that it does is creates a parallel enforcement scheme in state court for the exact thing that the federal agency has decided should be heard by the ADR tribunal, and that the Supreme Court and Congress have said that that tribunal is the only forum in which those can be heard. That has preemptive effect, and it completely extinguishes this statute. Whatever you may think about silence and delivery and price, that is just an independent problem with the statute. And the last thing I would say about that is, if Your Honor were to compare Arizona versus United States, Section 4A, that's the field preemption section of Arizona, and just the language the Supreme Court uses to describe the centrality of unified federal control of that area, and then just read Astra versus City of Santa Clara and compare the language that the court uses to describe the importance of unified, harmonious federal control of the 340B program, it is the same words. So we know that what the Supreme Court and Congress expects is that the agency is going to be in complete control of this issue. And lawsuits, according to Astra, lawsuits about that subject in court take away the agency's exclusive control of that issue, and that is what the state has done here is to authorize the lawsuits in state court about the same thing the Supreme Court has said there cannot be lawsuits about at all. For all of those reasons, we submit that the order below should be reversed. Thank you. Thank you, counsel. That concludes argument in this case.